**Douglas R. SABO, Plaintiff,**

v.

**Shirley CHATER, Commissioner of Social Security, Defendant.**

No. 95–1139–CIV–T–25C.

United States District Court,
M.D. Florida,
Tampa Division.

Nov. 7, 1996.

Patrick F. McArdle, McArdle & Schmoyer, Sarasota, FL, for plaintiff.

Susan R. Waldron, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, for defendant.

### *ORDER*

ADAMS, District Judge.

Before the Court is the Magistrate Judge's Report and Recommendation (Dkt. 14) advising this Court that the decision of the Administrative Law Judge ("ALJ") below should be reversed and remanded. Upon consideration of the Report and Recommendation of the Magistrate Judge, and upon this Court's review of the record, the Court finds that the

Report and Recommendation should be adopted. Accordingly, it is,

**ORDERED AND ADJUDGED** that:

1. The Magistrate Judge's Report and Recommendation (Dkt. 14) is adopted and incorporated by reference in this Order.

2. The decision of the ALJ is **RE-VERSED.** This cause is **REMANDED** to the Commissioner to apply the Program Operations Manual System regulation for evaluating chronic fatigue syndrome in reassessing plaintiff's disability.

**DONE AND ORDERED.**

Sept. 26, 1996.

### REPORT AND RECOMMENDATION

JENKINS, United States Magistrate Judge.

Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42, United States Code, Section 405(g) to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying claims for disability insurance benefits under the Act.[1]

The undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

In an action for judicial review, the reviewing court must affirm the decision of the Commissioner if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983). If there is substantial evidence to support the Commissioner's findings, this Court may not decide the facts anew or substitute its judgment as to the weight of the evidence for that of the Commissioner. *Goodley v. Harris,* 608 F.2d 234, 236 (5th Cir.1979).

If an error of law was committed by the Commissioner, the case must be remanded to the Commissioner for application of the correct legal standard. *McDaniel v. Bowen,* 800 F.2d 1026, 1029–30 (11th Cir.1986); *Smith v. Heckler,* 707 F.2d 1284, 1285 (11th Cir.1983). If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then a remand to the Commissioner for clarification is required. *Jamison v. Bowen,* 814 F.2d 585 (11th Cir.1987).

Plaintiff contends that the decision of the Commissioner must be reversed because: 1) the Commissioner's finding that plaintiff retained the residual functional capacity to perform a full range of sedentary work is not supported by substantial evidence; and 2) the Commissioner did not properly evaluate plaintiff's complaints of pain.

### I

Plaintiff, 39 years old at the time of his onset of disability, has a high school education and previously worked as a carpenter, cabinet maker and construction supervisor and contractor. Plaintiff asserts he became disabled on May 15, 1991 due to chronic fatigue syndrome, fibromyalgia, and depression. (T 16)

The ALJ found that plaintiff had not engaged in substantial gainful activity since May 15, 1991 and had chronic fatigue syndrome and migraine headaches, but did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ determined that plaintiff's testimony and allegations regarding pain and other symptoms were not fully credible and plaintiff had the residual functional capacity to perform a full range of sedentary work. The ALJ found that plaintiff's impairments prevented him from performing his past relevant work but plaintiff was capable of performing other jobs which exist in significant numbers in the national economy. The ALJ therefore concluded that plaintiff was not under a "disability" as defined in the Act. (T 15–23) The Appeals Council affirmed the decision. (T 3–4)

---

1. This matter has been referred to the undersigned by the District Court for consideration and a Report and Recommendation. See Local Rules 6.01(b) and 6.01(c), M.D.Fla.

## II

Herbert F. Hope–Gill, M.D. began treating plaintiff on July 23, 1990. At that time, plaintiff complained he lacked energy. Dr. Hope–Gill's notes indicate that plaintiff had been diagnosed with fibromyalgia eight months prior to the visit. Plaintiff also had hypoglycemia and suffered from severe headaches for the past seven years. He further complained of jaw and muscle aches. Laboratory tests were suggestive of an Epstein–Barr virus infection at some time in the past. (T 111, 113)

When plaintiff returned on August 30, 1990, he reported that he was no better on Zorvirax and complained of aching in his upper legs and knees. (T 109) When plaintiff returned for a re-check on October 1, 1990, he continued to state that the Zorvirax did not help and that he was still "very fatigued". He reported he fell asleep about five times a day and had insomnia at night. He was prescribed Ritalin, Prozac and Fiorinal. (T 108)

On December 6, 1990 plaintiff returned with torn ligaments in his right foot and wanted to discuss his medications. He stated that he was still drowsy but "[felt] good" and was "much less" fatigued. (T 107–08) During his February 21, 1991 visit, plaintiff indicated he took about four Tylenol # 3 a day and was also using it for left thigh pain. He complained that he has headaches every day and sleeps poorly. He was prescribed Imipramine. On April 4, 1991 plaintiff reported that the medication was helping and his headaches were much less frequent. He continued to complain of poor sleep. (T 106)

When plaintiff returned on May 8, 1991 he stated that his headaches had been mild for several months but he still had them almost daily. He complained of a "very deep" left thigh ache and aches in his arms. (T 105) On June 11, 1991 plaintiff reported he recently had the flu but had made a good recovery. However, he had lost five pounds in five weeks. He returned on July 26, 1991 complaining of the same symptoms. (T 104)

On August 12, 1991 plaintiff requested a Cortisone injection in his left shoulder. He had lost three pounds and complained of insomnia. He returned on September 5, 1991 complaining of flu symptoms including a fever and sweats, but he stated he had been sleeping better. (T 103) On October 3, 1991 plaintiff was given a flu injection and one week later requested another Cortisone injection in his left shoulder. He continued to complain of pain in his left shoulder and five days later the pain was still "very severe". On November 18, 19991 he had gained 2 pounds but complained of suffering from the flu twice in one and a half weeks as well as a dry cough. (T 102)

On January 3, 1992 Dr. Hope–Gill noted that plaintiff had gained 16 pounds in four months. Plaintiff returned on February 25, 1992 complaining he had been very sleepy the week before and continued to suffer from headaches. (T 101) The following month he reported that the injections helped his headaches but his sinuses ached. (T 100)

In May 1992 plaintiff was administered a Cortisone shot for his headaches. He returned to see Dr. Hope–Gill in June and July and complained that his various medications and antibiotics were not working. (T 99) He was given another Cortisone injection in August and on September 8, 1992 plaintiff complained of a chest cold and cough. Additionally, he had lost four pounds. (T 98) On November 2, 1992 plaintiff complained that his neck was causing him pain and he was given a flu shot. Dr. Hope–Gill noted an improvement. However, plaintiff also stated he could not work because it was "so exhausting". (T 97)

By December 23, 1992 plaintiff had lost four pounds. He stated that Tylenol # 3 helped his headaches. (T 96) On January 16, 1993 plaintiff reported that his leg and back pain had been worsening over the past two weeks. He also indicated that he had spent most of the last three days in bed. (T 95)

On February 23, 1993 plaintiff indicated that he had applied for social security disability benefits and that the "DHEA" helped. He continued to complain of severe pain in the back and neck and chronic headaches. (T 96) Dr. Hope–Gill opined that plaintiff did not need a cane to ambulate, his range of motion was full and complete, and there were

no neuro-deficits. However, he. determined that plaintiff suffered from severe low back pain and fibromyalgia related to his chronic fatigue syndrome and, as a result, plaintiff suffered considerable pain when he walked. (T 94)

Plaintiff also had a noticeable limp and his movement was slow. Additionally, he had considerable pain upon rotation of his neck and using his shoulders and suffered from frequent muscle spasms in his neck and back. There was no muscle weakness and plaintiff's grip strength and manual dexterity was good. (T 94)

On May 21, 1993 plaintiff reported that the whole family was suffering from flu and cold symptoms. (T 93)

Kala Seshadri, M.D. performed a consultative examination on plaintiff on March 5, 1993. Plaintiff complained of feeling tired, problems with insomnia, and a history of asthma. He also complained of constant stiffness in the neck and pain in the hip joints and other joints. He reported he could walk 1–2 miles on good days and has no problem climbing. He indicated his pain worsened upon bending but he was "stable lately." (T 114)

Plaintiff appeared healthy and not in acute distress. A physical examination of the neck did not reveal any "JVD or carotid bruit" and his extremities revealed no edema. A musculoskeletal examination revealed no acute joint inflammation of the joints and plaintiff's range of motion, gait, grip strength and dexterity were normal. Dr. Seshadri opined that plaintiff's complaints were "out of proportion to the objective findings on examination." (T 114–115)

Kenneth Kiehl, M.D. began treating plaintiff on February 20, 1987. Plaintiff reported he was currently taking Tofranil, Darvocet, and Zorvirax. (T 120) On December 1, 1988 plaintiff received a flu shot. On February 27, 1989 and March 7, 1989 and December 1, 1989 plaintiff complained of headaches and requested Tylenol #3. Additionally, from December 1988 through May 1990, plaintiff requested and was prescribed Halcion, Librax, Polaramine, Xanax, and Parafon Forte. (T 123)

On April 8, 1994 plaintiff complained of hip pain. Dr. Kiehl noted that plaintiff was taking medication for fibromyaliga. The notes also include a reference regarding possible white count syndrome. (T 118) On May 13, 1994 he complained of headaches, a sore throat, a stiff neck. Dr. Kiehl diagnosed plaintiff as having depression, psychosomatic disease, a deviated septum, questionable chronic fatigue syndrome, and questionable fibromyalgia. (T 119) Plaintiff was given a cholesterol consultation on May 24, 1994. (T 117, 121–122)

Philip K. Nelson, M.D., a gynecologist, began treating plaintiff on November 8, 1993. Plaintiff reported that he was self-employed at Sabo's adult congregate living facility (ACLF). His lymph nodes were tender but not enlarged, his stance was abnormal and he had multiple trigger points. (T 130) On February 28, 1994 plaintiff complained of the flu, canker sores in his mouth, and bad nerves. On March 24, 1994 he complained of headaches and nausea. On August 1, 1994 he indicated he had seen Dr. Kiehl. (T 129)

Dr. Nelson completed a Treating/Examining Source Statement of Physical Capacity for plaintiff on August 8, 1994. He opined that plaintiff's history and clinical observation indicated that his ability to lift and carry were not affected and he could lift up to ten pounds occasionally. Plaintiff could stand and/or walk up to two hours a day without interruption and sit for the same amount of time. He could climb, balance, stoop, crouch, kneel, and crawl occasionally and had no problems reaching handling and feeling. However, Dr. Nelson reported that repetitive pushing or pulling caused exhaustion and plaintiff's seeing and speaking were affected by "neurocognitive abnormalities." Plaintiff had environmental restrictions related to balance problems and exhaustion after exercise. Dr. Nelson opined that plaintiff had "activity induced fatigue and cognitive (memory, attention span) problems which make employment impossible." (T 124–25)

Dr. Nelson also completed a mental residual functional capacity assessment for plaintiff. He opined that plaintiff's ability to remember locations and procedures and to understand and remember detailed instructions was

markedly limited. He also was of the opinion that some of plaintiff's sustained concentration and persistence skills were markedly limited such as the ability to carry out detailed instructions, maintain attention and concentration, and sustain an ordinary routine without special supervision. (T 126)

Plaintiff's social interaction skills were not limited except for his ability to get along with others without distracting them which was only moderately limited. Finally, his ability to respond appropriately to changes in work setting and to set realistic goals or make independent plans was moderately limited. (T 127)

Dr. Nelson opined that plaintiff's impairments preclude "his being able to pursue and [sic] ordinary work schedule." He explained that plaintiff "requires extended rest periods after even short (1–2 hour) work schedules." He further noted that plaintiff had neurocognitive disabilities including attention deficit, spacial orientation, word reversal, and problems with mental math. (T 128)

On February 16, 1993 plaintiff reported to B. Perry, an MD Adjudicator for the Office of Disability Determinations, Department of Labor and Employment Security, that he had no history of surgery. Plaintiff complained of severe headaches and joint and muscle pain. He did not suffer from any depression or mental history. Plaintiff reported taking two hour naps throughout the day on bad days. He further reported that on good days he is able to take short trips or run errands. Plaintiff stated that he was able to concentrate on simple tasks and had no difficulty with his memory. Finally, plaintiff admitted that his Cortisone injections seemed to help his hip pain. (T 91)

On June 14, 1993 plaintiff's wife told W. Owens, apparently a representative of the Office of Disability Determinations, that plaintiff had no mental history and was not seeing a psychiatrist. She confirmed that he experienced pain and fatigue which prevented him from performing regular activities of daily living and working. She explained that he had good days and bad days but cared for himself and could run errands such as shopping and going to the bank. She opined that plaintiff's memory was adequate but explained that plaintiff would sometimes get down on himself because he was unable to perform the physical activities he performed in the past. (T 90)

At the hearing, plaintiff testified that in 1983 he had mononucleosis and "never got totally back on my feet." (T 37) In May 1991 he came down with what he believed was the flu which he had for one month. About a week and a half after recovering he came down with the flu again. After the third time, he started getting gamma globulin injections. (T 38) Plaintiff testified he spends about ninety percent of his day in a recliner and suffers from constant cold sweats. He has the strength to walk to the bathroom and back. He also suffers nausea and lost fifteen to twenty pounds because he could not eat. (T 39)

Plaintiff further testified that he has pain in his hips and his thighs. He stated that the pain gets very bad when he lifts over 40 pounds. Plaintiff further stated he had Cortisone shots in his hips, and neck and shoulder area. He also suffers from neck spasms and stiff shoulders. (T 39–40)

Plaintiff testified that he had been on antidepressants for eleven years and had taken Amitriptyline and Prozac as well as Tylenol for pain and Procardia for high blood pressure and heart rate. (T 40–41) He explained that on a typical day he is up for two hours. For instance, he may be up for an hour and have 20 minutes or a half an hour of "good time" and then go back to bed. He gets up about 9:00 or 10:00 a.m. for about an hour and then naps from 11:00 to 12:00 or 12:30 p.m.. Then he does jobs around the house or runs errands. He gets back in bed in the late afternoon. After dinner he has about an hour to wind down and goes to bed about 7:00 or 8:00 p.m. (T 41–42)

Plaintiff testified he drives about 70 miles a week and helps to keep up the house by fixing faucets and hanging towel bars. (T 41–42) He testified that he has tried not to rest during the day but when he pushes himself through a day he cannot function the next day. (T 43) Further, plaintiff stated that he sees Dr. Hope–Gill and Dr. Nelson, but he has more phone contact with Dr.

Nelson then office visits. (T 44) Finally, plaintiff testified that he weighed about the same as in 1983 or probably "picked up some" weight. (T 47–48)

### III

The main issue here is whether the Commissioner erred in failing to apply the guidelines set forth in defendant's Program Operations Manual System (POMS) for evaluation of complaints relating to chronic fatigue syndrome in determining plaintiff's residual functional capacity. Surprisingly, the Commissioner does not respond to this argument.[2]

The ALJ determined that plaintiff suffered from chronic fatigue syndrome and migraine headaches, but he did not have an impairment or combination of impairments which would qualify him for disability. Further, the ALJ found that plaintiff had the residual functional capacity to perform a full range of sedentary work. The ALJ based the findings on the medical and documentary evidence which he found undermined plaintiff's credibility regarding his allegations of frequency and intensity of symptoms. In determining that plaintiff's testimony was not credible as well as his residual functional capacity, the ALJ did not refer to the POMS guidelines.

The guidelines provide:

Chronic Fatigue Syndrome (CFS), previously known as Chronic Epstein–Barr Virus Syndrome, and also currently called Chronic Fatigue and Immune Dysfunction Syndrome, is a systemic disorder consisting of a complex of variable signs and symptoms which may vary in duration and severity. The etiology and pathology of the disorder have not been established. Although there are no generally accepted criteria for the diagnosis of cases of CFS, an operational concept is used by the medical community. There is no specific treatment, and manifestations of the syndrome are treated symptomatically.

CFS is characterized by the presence of persistent unexplained fatigue and by the chronicity of other symptoms. The most prevalent symptoms include episodes of low-grade fever, myalgias, headache, painful lymph nodes, and problems with memory and concentration. These symptoms fluctuate in frequency and severity and may be seen to continue over a period of many months. Physical examination may be within normal limits. Individual cases must be adjudicated on the basis of the totality of evidence, including the clinical course from onset of the illness, symptoms, signs, and laboratory findings. Consideration should be given to onset, duration, severity and residual functional capacity following the sequential evaluation process.

*Rose v. Shalala,* 34 F.3d 13, 16 (1st Cir.1994), citing POMS § DI 24575.005 (1993). "[B]ecause the methods for diagnosing chronic fatigue syndrome are limited, the credibility of the claimant's testimony regarding [his] symptoms takes on 'substantially increased' significance in the ALJ's evaluation of the evidence." *Fragale v. Chater,* 916 F.Supp. 249, 254 (W.D.N.Y.1996) (citation omitted). Moreover, "[chronic fatigue syndrome] is recognized by the Social Security Administration as a disease which, while not specifically addressed in the Listings, may produce symptoms which significantly impair [a] claimant's ability to perform even sedentary work ..." *Id.* at 253–54 (citations omitted).

In evaluating a plaintiff's testimony the Eleventh Circuit has held that the Commissioner must articulate specific and adequate reasons for rejecting a plaintiff's subjective complaints of pain. *Allen v. Sullivan,* 880 F.2d 1200, 1203 (11th Cir.1989); *Cannon v. Bowen,* 858 F.2d 1541, 1545 (11th Cir.1988). Furthermore, the reasons given by the Commissioner for refusing to credit a plaintiff's subjective pain testimony must be supported by substantial evidence. *Hale v. Bowen,* 831 F.2d 1007, 1012 (11th Cir.1987).

In evaluating plaintiff's credibility, the ALJ noted that objective physical examinations of plaintiff revealed no edema, joint inflammation or muscle weakness. Addition-

---

**2.** Neither the ALJ nor the Appeals Council cites to the POMS regulations in their decisions. However, it is unclear whether plaintiff argued, at that level, that the POMS regulation was applicable.

ally, plaintiff had a complete range of motion and normal grip and dexterity. (T 19; 94, 115) The ALJ further noted that plaintiff reported he could lift forty pounds, drive, and perform repairs and run errands. (T 19; 39, 41–42, 91)

According to the ALJ, other evidence indicated plaintiff could walk 1–2 miles, climb, and work at the ACLF operated by his wife. (T 19; 114) For instance, plaintiff's wife stated he could run errands and both Dr. Seshadri and Dr. Nelson reported that plaintiff worked at the ACLF run by his wife. (T 90; 114; 130)

The ALJ also relied on the fact that plaintiff reported his pain was relieved by medication and had not complained of any side effects. (T 19; 91, 93, 96, 99–100) Additionally, other than Dr. Nelson, none of plaintiff's physician placed restrictions on plaintiff's activities. (T 20) Finally, while plaintiff testified at the hearing that he was depressed and suffered from a poor memory and a lack of concentration, he reported in February 1993 that he was able to concentrate on simple tasks and had no problems with his memory and his wife reported that plaintiff had no mental history and his memory was adequate. (T 20; 90–91)

However, the ALJ failed to discuss the evidence that supports plaintiff's subjective complaints. For instance, plaintiff's July 23, 1990 blood test was positive for the Epstein–Barr antibody. (T 111) Further, Dr. Hope–Gill, one of plaintiff's treating physicians, diagnosed plaintiff as suffering from chronic fatigue syndrome. (T 94) He also diagnosed plaintiff as having fibromyalgia, a condition "not inconsistent with a diagnosis of CFS". See Fragale, 916 F.Supp. at 254. Dr. Nelson, a second treating physician, opined that plaintiff had "activity induced fatigue" and cognitive problems. (T 124–25) Dr. Kiehl, a third treating physician, diagnosed plaintiff as suffering from depression, psychosomatic disease, and a deviated septum and questionable chronic fatigue syndrome and fibromyalgia. (T 119)

A fourth physician, Dr. Seshadri, examined plaintiff on March 5, 1993. Dr. Seshadri found that plaintiff suffered from problems with chronic tiredness of an unclear etiology but opined that plaintiff's complaints were "out of proportion to the objective findings on examination." (T 114–115)

Of the four physicians, Dr. Nelson is the only one who specifically opined that plaintiff was unable to work. The ALJ gave little weight to Dr. Nelson's opinion, however. The ALJ explained that "Dr. Nelson's statements concerning claimant's physical and mental capabilities are conclusory and are not supported by objective evidence." (T 20)

Generally, a treating physician's opinion is entitled to more weight than that of a consulting physician's opinion. Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984). Accordingly, substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to disregard them. Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir.1991).

The ALJ explained that the record indicates that plaintiff visited Dr. Nelson only two or three times and had one physical examination since the beginning of his "treatment" in November 1993. (T 19; 129–30) Further, the only positive findings by Dr. Nelson were tender lymph nodes, an abnormal stance, and multiple trigger points. (T 21; 130)

The ALJ further expressed concern that there was no evidence that Dr. Nelson performed a mental evaluation of plaintiff. Moreover, the ALJ pointed out that Dr. Nelson is a gynecologist and his area of expertise is not "immune disorders, orthopedics, psychology, or psychiatry". (T 21; 44) Additionally, none of plaintiff's other physicians placed any restrictions on him or reported any significant limitations on his activities. Nor did any other physician report that plaintiff's work activity was restricted due to a mental impairment. (T 20)

However, it is not unusual for a person suffering from chronic fatigue syndrome to undergo physical examinations resulting within normal limits. See Williams v. Shalala, Case No. 94–CV–426S, 1995 WL 328487, *6–7 (W.D.N.Y. May 19, 1995) ("because chronic fatigue syndrome is diagnosed partially through a process of elimination, an extended medical history of 'nothing wrong'

diagnoses is not unusual for a patient who is ultimately found to be suffering from the disease") (citation omitted); *Rose,* 34 F.3d at 18 ("lack of objective proof is what one may expect in cases of CFS").

Additionally, while plaintiff did not profess that Dr. Nelson specialized in chronic fatigue syndrome, he testified that Dr. Nelson and Dr. Hope–Gill were the only two doctors in Sarasota that "really deal with the chronic fatigue and the fibromyalgia". (T 44) Plaintiff explained that he was referred to Dr. Nelson by Dr. Bloom (an allergy specialist who had treated plaintiff at one time) when Dr. Hope–Gill retired. Dr. Bloom told plaintiff that Dr. Nelson had conducted research regarding chronic fatigue and attended numerous seminars because Dr. Nelson's wife suffered from chronic fatigue. (T 45)

Further, Dr. Nelson's diagnosis that plaintiff suffered from activity induced fatigue is not inconsistent with Dr. Hope–Gill's diagnosis of chronic fatigue syndrome. Finally, only Dr. Seshadri expressed an opinion that plaintiff's complaints were disproportionate with the medical findings. However, Dr. Seshadri based his opinion on the lack of objective medical evidence. (T 114–15)

The record further contains various reports that plaintiff complained of insomnia, poor sleep, depression, headaches, pain, sore throat, and fatigue. (T 95–97; 101–03; 105–08; 113–114; 119; 129) Such symptoms are consistent with chronic fatigue syndrome. *See Fragale,* 916 F.Supp. at 253–54.

Additionally, while plaintiff reported in February 1993 that he did not have any problems with his memory or depression, he testified at the hearing that he was forgetful and had been on antidepressants for eleven years. (T 40; 91) In his May 6, 1993 request for reconsideration, plaintiff reported that he suffered from poor concentration and memory as well as depression. (T 64–69) Dr. Kiehl diagnosed plaintiff as suffering from depression on May 13, 1994. (T 119)

Furthermore, while the ALJ relied on plaintiff's testimony that he could drive, he did not include any reference to plaintiff's testimony that after driving to the hearing and back, he would probably spend most of the rest of the day in bed. (T 41) In addition, plaintiff testified that his symptoms were unpredictable and explained that just because "today is a certain way doesn't mean tomorrow is going to be that way." (T 47) Although plaintiff's wife reported that plaintiff could run errands and his memory was adequate, she also reported that plaintiff experienced pain and fatigue that prevented him from performing activities of daily life. She explained that he had good days and bad days and that plaintiff "gets down on himself because he just can't do the things he used to physically." (T 90)

Finally, while Dr. Seshadri reported that plaintiff worked at the ACLF and could climb, he also reported that plaintiff complained of tiredness and poor sleep at night. Further, Dr. Seshadri reported plaintiff could walk one to two miles on his *good days.* (T 114) (emphasis added)

Accordingly, for these reasons, the court finds that the Commissioner's findings regarding plaintiff's credibility and residual functional capacity should be reversed. Upon remand, the Commissioner should apply the POMS regulation for evaluating chronic fatigue syndrome in reassessing plaintiff's disability.

It is therefore RECOMMENDED:

(1) The decision of the Commissioner denying disability and SSI insurance benefits be reversed and remanded consistent with foregoing.