**Aida BAGUER, Plaintiff,**

v.

**Kenneth APFEL, Commissioner of Social Security, Defendant.**

No. 98–849–CIV–ORL–22C.

United States District Court,
M.D. Florida,
Orlando Division.

Sept. 17, 1999.

Juan Jose Rosario, Law Office of Juan J. Rosario, Winter Park, FL, for Plaintiff.

Roberta M. Bahnsen, Randall Gold, U.S. Atty's Office, Middle District of Florida, Orlando, FL, Mary Ann Sloan, General Counsel's Office, Social Security Administration, Atlanta, GA, for Defendants.

## ORDER

GLAZEBROOK, United States Magistrate Judge.

Plaintiff Aida Baguer ["Baguer"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for a period of disability, disability insurance benefits, and supplemental security income. *See* Docket No. 1. The matter is before the Court on consent pursuant to 28 U.S.C. § 636(c)(1). For the reasons set forth below, the Commissioner's decision is **REVERSED.**

## I. *PROCEDURAL HISTORY*

On May 26, 1995, Baguer filed her claim for disability and SSI benefits, claiming disability as of December 12, 1991. R. 100–04. Baguer last met the disability insured status requirements of Title II on December 31, 1996. R. 115. On January 9, 1999, the Honorable James R. Ciaravino, Administrative Law Judge ["ALJ"], held a 47–minute hearing on Baguer's claim. R. 51–98. Baguer was represented by attorney Chadwick Lawrence at the hearing. R. 51. The ALJ heard testimony by Baguer.

On June 20, 1997, the ALJ issued his decision that Baguer was not entitled to disability, disability insurance benefits, or SSI under sections 216(i) and 223 of the Social Security Act. R. 16–26. Following his review of the psychiatric, medical and other record evidence, the ALJ found that Baguer retained the residual functional capacity to perform some work-related activities, except for work involving lifting and carrying more than fifteen pounds. R. 26, Finding 5. The ALJ also found that Baguer had to work by herself, and had to be responsible for her own individual work assignments because of her nonexertional limitations. R. 26, Finding 5. With these restrictions, the ALJ found that Baguer could return to her past relevant work as an assembly line worker. R. 26, Finding 5.

On June 19, 1998, the Appeals Council denied review. R. 6. On July 24, 1998, Baguer timely appealed the Appeals Council's June 19, 1998 decision to deny review to the United States District Court. Docket No. 1. On July 31, 1998—after the first denial of review and while the appeal was pending in the United States District Court—the Appeals Council considered additional evidence that Baguer had been hospitalized for depression with psychosis from April 30, 1998 to May 2, 1998.[1] R. 4–5, 9–10. The Appeals Council concluded that Baguer's recent hospitalization for Psychosis Not Otherwise Specified with Depression and Anxiety did not pertain to the period under consideration because it occurred well after the date of the hearing decision (June 20, 1997), and that Baguer had not shown any psychiatric limitations persisting after May 2, 1998. R. 4, 9.

The Appeals Council did note that Baguer had had similar psychotic episodes in the past, but found them to have been infrequent and responsive to medication. R. 4–5, 9–10. The Appeals Council therefore concluded that the new evidence of psychosis provided no basis to change the ALJ's decision, and that the ALJ's findings were not contrary to the weight of the evidence of record at the time of Appeals Council review. R. 4–5. The Appeals

---

1. Although Baguer alleges that the Commissioner did not include the additional evidence in the record, Docket No. 15 at 1, n. 1, the record on appeal does contain two pages of medical records relating to the April 3 to May 2 hospitalization. R. 8–10. The Court has no way to determine whether the Appeals Council considered additional evidence.

Council therefore again denied review on July 31, 1998. R. 4–5.

On October 23, 1998, *the Commissioner found that Baguer was in fact disabled as of July 23, 1998,* the date she had protectively filed a new application, and that Baguer indeed was entitled to supplemental security income benefits after that date. Docket No. 15, Appendix 1. The Commissioner found that Baguer had been disabled beginning on July 23, 1998—approximately eight days *before* the Appeals Council denied review.[2] In other words, *Baguer was disabled on July 31, 1998— the date that the Appeals Council denied review.*

On February 11, 1999, Baguer filed a memorandum of law in support of her appeal of the denial of review. Docket No. 15. On April 19, 1999, the Commissioner filed a memorandum in support of his decision determining that she was not disabled. Docket No. 20. The Commissioner's brief neither mentioned nor discussed his determination that Baguer was disabled and entitled to SSI benefits on the day that the Appeals Council denied review.[3] The appeal is ripe for determination.

## II. *THE PARTIES' POSITIONS*

Baguer contends that the Commissioner failed to properly consider the totality of her combined mental and physical impairments (including information in the medical report of William W. Austin, Psy. D.), and also failed to properly credit Baguer's testimony, when he found that she did meet Listing 12.06 for Anxiety Related Disorder, and when he further found that she retained the ability to perform her past work as an assembly line worker. Docket No. 15 at 3–17. Baguer also argues that the Commissioner failed to develop a full and fair record because Baguer was unable to communicate in English.

Docket No. 15 at 17. The Commissioner argues that Baguer failed to meet her burden of proving that her combined psychiatric and spinal conditions met any Listing, and that her combination of conditions prevented her from returning to her past work.

## III. *THE STANDARD OF REVIEW*

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir.1995), *citing Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982) and *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *accord, Edwards v. Sullivan,* 937 F.2d 580, 584 n. 3 (11th Cir.1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan,* 937 F.2d 580, 584 n. 3 (11th Cir.1991); *Barnes v. Sullivan,* 932 F.2d 1356, 1358 (11th Cir.1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560; *accord, Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir.1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir.1986) (court also must consider

---

**2.** The Commissioner found that Baguer's disability onset date (July 23, 1998) was approximately twelve weeks after her psychiatric hospitalization (April 30, 1998 to May 2, 1998). R. 4, 9–10.

**3.** The Court understands that, on occasion, a claimant might be able to prove disability as of the date of a protectively filed claim when she was unable to prove disability a few days earlier. Baguer's long psychiatric history demonstrates that this is not such a case.

evidence detracting from evidence on which Commissioner relied).

The district court will reverse a Commissioner's decision on plenary review, however, if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir.1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. *Bowen v. Heckler*, 748 F.2d 629, 631, 636–37 (11th Cir.1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089–92, 1095, 1098 (11th Cir.1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090–91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 827, 829–30 (11th Cir.1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to

treatment and could work in a supportive, noncompetitive, tailor-made work environment). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir.1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court … may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material—relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090–92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir.1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir.1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir.1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir.1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095.

The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[4]  *Id.*

## IV. *THE LAW*

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

### A. *Treating Physicians*

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan,* 125 F.3d 1436, 1439–1441 (11th Cir. 1997); *Edwards v. Sullivan,* 937 F.2d 580, 583 (11th Cir.1991); *Sabo v. Commissioner of Social Security,* 955 F.Supp. 1456, 1462 (M.D.Fla.1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments, is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards,* 937 F.2d· 580 (ALJ properly discounted treating physician's report where

the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler,* 784 F.2d 1073, 1075 (11th Cir.1986); *see also Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir.1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler,* 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determina-

---

4.  The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson,* 99 F.3d at 1089, 1095 n. 4 and surrounding text. In a sentence-four remand,

the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

tion is the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

## B. *Developing the Record*

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir.1988); *Cowart v. Schweiker*, 662 F.2d 731, 735–36 (11th Cir. 1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C. § 406; *Cowart*, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart*, 662 F.2d at 735–36. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934–35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir.1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such psychiatrists and psychologists, and facilities such as hospitals and clinics. Adequate descriptions of functional limitations must be obtained from these or other sources which may include programs and facilities where the individual has been observed over a considerable period of time.

Information from both medical and nonmedical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, sheltered work-shops, etc. It can also be provided by others, including family members, who have knowledge of the individual's functioning. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerable over time. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D).

Particular problems are often involved in evaluating mental impairments in individuals who have long histories repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of

increased stress. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P., App. 1, 12.00(E).

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594(iv).

### C. Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir.1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. Holladay v. Bowen, 848 F.2d 1206, 1209 (11th Cir.1988); Reeves v. Heckler, 734 F.2d 519, 522 n. 1 (11th Cir.1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

### D. The Five Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir.1993). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. See id., 985 F.2d at 534.

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir.1991). The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Ware v. Schweiker, 651 F.2d 408, 411 (5th Cir.1981); Demandre v. Califano, 591 F.2d 1088, 1090 (5th Cir.1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. See, e.g., Kirkland v. Weinberger, 480 F.2d 46

(5th Cir.1973); *Chance v. Califano,* 574 F.2d 274 (5th Cir.1978).

### E. *Other Work*

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater,* 67 F.3d 1553, 1559 (11th Cir.1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote,* 67 F.3d at 1558; *Allen v. Sullivan,* 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical–Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e); *Foote,* 67 F.3d at 1559; *Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen,* 826 F.2d 996, 1002–03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote,* 67 F.3d at 1559; *Chester v. Bowen,* 792 F.2d 129, 132 (11th Cir.1986); *see also MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir.1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert). It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan,* 880 F.2d 1200, 1202 (11th Cir.1989); *Ferguson v. Schweiker,* 641 F.2d 243, 248 (5th Cir.1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote,* 67 F.3d at 1559.

### 1. *Pain*

Pain is a non-exertional impairment. *Foote,* 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even

when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir.1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### 2. *Credibility*

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote*, 67 F.3d at 1561–62; *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir.1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir.1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1561–62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir.1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir.1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983)) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V. *APPLICATION AND ANALYSIS*

### A. *District Court Must Review Appeals Council Evidence*

■ After the ALJ's decision—but before the appeal was decided—Baguer submitted additional medical records covering her psychiatric hospitalization from April 30, 1998 through May 2, 1998 for Psychosis Not Otherwise Specified with Depression and Anxiety. R. 9–10. The Appeals Council properly made the medical records a part of the record, R. 9–10, and also considered them in denying review. R. 4. The Commissioner ignores the Appeals Council's additional evidence in his brief. Docket No. 20 at 8; R. 9–10. for the following reasons, the district court will consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g). The Commissioner does not argue that the Appeals Council's denial of Baguer's request for review is not a "final determination" on the merits within the meaning of § 405(g). *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983) (that argument would make "no legal sense"). The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence. R. 4; 20 C.F.R. § 416.1470; *Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir.1986) (en banc). The Appeals Council's decision is subject to judicial review to determine if it is supported by substantial evidence. *Parker v. Bowen*, 788 F.2d at 1517, 1519–20 (Appeals Council had reversed ALJ on its own motion and had not denied review).

When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review. 20 C.F.R. §§ 404.970(b); 416.1470(b); *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir.1994). Furthermore, the Appeals Council commits reversible error when it review after refusing to consider new evidence. *Keeton*, 21 F.3d at 1066. Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ—and to ignore the new evidence presented to the Appeals

Council—in reviewing a decision of the Appeals Council. *Keeton*, 21 F.3d at 1066.

The Commissioner does not dispute that the Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir.1998). Indeed, the Appeals Council considered and evaluated the new evidence of hospitalization for psychosis and depression in this case. R. 4, 9–10. When the Appeals Council has denied review, the district court will look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence. *Falge*, 150 F.3d at 1323; *accord, Eads v. Secretary of Health and Human Services*, 983 F.2d 815, 817 (7th Cir.1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).

But there is an important difference between these facts and those in *Falge* —a difference stressed by the United States Court of Appeals for the Eleventh Circuit. In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review. Instead he appealed only the ALJ's decision to deny benefits. 150 F.3d at 1324. In this case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's decision to deny review.[5] *See* Docket No. 1 at 1, ¶ 4 (complaint). The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review. *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision—the last step of review necessary to exhaust administrative remedies. If the Appeals Council refuses to consider new evidence

submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. *Keeton*, 21 F.3d at 1066. Similarly, if the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record). The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, Baguer has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting her administrative remedies. The Appeals Council has considered the Baguer's additional evidence in light of the issues raised in her request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence. The Appeals Council's determination is subject to judicial review.[6]

---

**5.** This Court treats Baguer's appeal from the Appeals Council's first denial of review on June 19, 1998, R. 6, as an appeal of the Appeals Council's decision denying review on July 31, 1998, R. 4. This Court also treats the denial of review on July 31, 1998 as the final decision of the Commissioner for the pur-

poses of seeking substantive judicial review, even though jurisdiction rested with the district court after July 24, 1998. *See* Docket No. 1 (appeal filed).

**6.** The Commissioner cannot avoid judicial review of the Appeals Council's final decision by

**B. *Listing 12.06—Anxiety Related Disorder***

■ In finding that Baguer did not meet Listing 12.06 for Anxiety Related Disorder, Baguer contends that the Commissioner failed to properly consider and weigh the totality of her combined mental and physical impairments (including information in the medical report of William W. Austin, Psy. D.), and also failed to properly credit Baguer's testimony. Docket No. 15 at 3–17; R. 318–23. Baguer is correct.

Listing 12.06 for Anxiety Related Disorder provides as follows:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.   Medically documented findings of at least one of the following:

1.   Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

    a.   Motor tension; or

    b.   Autonomic hyperactivity; or

    c.   Apprehensive expectation; or

    d.   Vigilance and scanning;

or

2.   A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.   Recurrent obsessions or compulsions which are a source of marked distress; or

5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B.   Resulting in at least two of the following:

1.   Marked restriction of activities of daily living; or

2.   Marked difficulties in maintaining social functioning; or

3.   Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4.   Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors); OR

C.   Resulting in complete inability to function independently outside the area of one's home.

Baguer testified that she had been hospitalized for five days for suicidal thoughts in 1978 before coming to the United States. R. 82–83. Baguer was admitted to Saint James Hospital in Newark, N.J. from February 24, 1994 through March 24, 1994 due to chest pain and unstable angina. R. 187–209. Baguer had heart palpitations, with a past history of dizziness, nerves, palpitations. The principal diagnosis was chest pain, cause undetermined, with a secondary diagnosis of osteoarthritis of the cervical spine. R. 187. Baguer had a psychiatric history of depression,

---

passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review." *See* *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)).

nervousness, and anxiety. R. 192, 195. On May 23, 1995, John F. Huhn, M.D. of Florida Otorinolaringology Group examined Baguer. R. 214–15. Dr. Huhn examined a "very anxious female," R. 214, but found only reflux induced chemical laryngitis. R. 215.

On December 19, 1995, consulting psychologist Eric S. Wiener, Ph.D. diagnosed an Adjustment Disorder with Anxious Mood, with a secondary diagnosis of Histrionic Personality Disorder. R. 144, 183, 185. Baguer's mental residual functional capacity assessment of December 10, 1995 states her impairments, showing a moderately limited ability to maintain attention and concentration; a moderately limited ability to work in coordination with or in proximity to others without being distracted; a moderately limited ability to complete a normal workday without interruptions from psychologically based symptoms; a moderately limited ability to interact appropriately with the general public; and moderately limited ability to respond appropriately to changes in the work setting. R. 146–47; *see also* R. 170– 83. Baguer's rating of mental impairment severity of December 10, 1995 also states her impairments: moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; often has deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner in work settings or elsewhere; and "once or twice" had episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw. R. 158.

Humana Health Care treated Baguer from January 17, 1995 through July 2, 1996, R. 222–63, for back pain, depression, dizziness, fatigue, nervousness, chest pain, burning sensation, chest pain, fatigue, and constant diarrhea. An MRI of the cervical spine showed herniation of the C5–6 disc posteriorly and centrally, causing a moderate degree of central stenosis and displacement of the cervical cord posteriorly. An MRI of lumbar spine showed mild bulging of the L5–S1 disc.

On January 17, 1995, a medical doctor saw Baguer due to severe anxiety, panic attacks, and heart palpitations, and determined that Baguer needed an evaluation with a psychiatrist to rule out bipolar disorder. R. 218–19. On September 12, 1995, Jose M. Suarez, M.D. saw Baguer at Osceola Mental Health Services for her ongoing depression and panic attacks, and prescribed Prozac, Xanax, and Buspar. R. 286.

Baguer has claimed to be disabled from anxiety and depression, with stress causing complete loss of control. R. 118. Baguer testified that she cries all the time at home, and becomes very upset for no reason. R. 81, 118. She is very depressed, and sometimes hears voices and sees things that are not there. R. 92, 95, 118. She is easily irritated by people around her, and becomes upset. R. 118. She sees nobody. R. 125. She has suicidal thoughts. R. 118.

Mount Sinai Medical Center of Greater Miami admitted Baguer on an emergency basis on November 8, 1995. R. 83, 216. She had jumped out of her friend's car in an attempt to kill herself on a trip to Miami. R. 83, 281–82. Baguer had atypical chest pains reproducible with sternal pressure, chostocondritis, and anxiety disorder. R. 217. Baguer denied suicidal ideation at the time, but testified at the hearing that she wanted to kill herself. R. 83. A cardiology consult told that her chest pains were secondary to nerves. R. 218.

The Osceola Evaluation and Treatment Center then saw Baguer on November 9, 1995, and involuntarily hospitalized her. R. 281. Baguer had feelings of suicide, severe anxiety, depression, and severe anger. R. 281–82. Baguer was poorly groomed, irritable with anxiety attacks, crying, decreased energy, easily agitated, very anxious and depressed mood, poor recent memory, insight and judgment, hyperverbal, with hallucinations of shadows and voices she will obey. R. 281. She had a history of suicidal ideation over five to six years. Baguer agreed to remain hospitalized for three to four days until stabi-

lized. R. 270. The diagnosis was DSM–IV 300.01 Panic Disorder without Agoraphobia.[7] R. 282.

Osceola Mental Health Services treated Baguer from June 24, 1996 through July 16, 1996, R. 264–96, after she again was discharged from the Osceola Evaluation and Treatment Center. Baguer complained of hypersomnia, anorexia, feelings of depression, reduced energy, and panic attacks. The doctors increased her dose of Klonopin, and advised her not to drive. Osceola Mental Health treatment notes report that Baguer was was hyper-talkative; her cognitive abilities were fair; her insight was limited; she showed narcissism with histrionic features; she put down everyone in the medical profession; she saw shadows and heard name-calling; her hands got cold. R. 286. Baguer was afraid of heights, of sleeping pills, of Ambien, and of driving.

A comprehensive psychosocial assessment at the Osceola Mental Health Services dated June 15, 1996 reports a DSM–IV diagnosis of Axis I—309.24 Adjustment Disorder with Anxious Mood (Provisional); Axis II—301.50 Histrionic Personality Disorder (Provisional); Axis III Skin Cancer (Controlled); Axis IV—Family problems (two children epileptic and platonic relationship with husband).[8] R. 294. Without therapy, the treating psychologists expected that Baguer may become completely isolated. R. 294.

Rosario A. Musella, M.D., F.A.C.S., treated Baguer from July 13, 1995 through September 28, 1995. R. 298–99 Baguer complained of dizziness and neck and low back pain after a car accident on March 3, 1995. Her complaints were consistent with unresolved post-traumatic head injury syndrome and unresolved cervical and thoracolumbar strain/sprain. MRI tests revealed herniated disc at C5–6 with mild central canal compromise as well as discogenic disease at the L–4 and L–5 levels with mild disc bulging at the L5–S1 level. Baguer complained of persisting headaches and dizziness, intermittent chest pains, left arm pain, persistent neck and low back pain.

Based on the clinical and radiological findings, Dr. Musella concluded that Baguer suffered permanent injuries. Examination revealed persistent mild impairment of range of motion of cervical and thoracolumbar spine associated with dysmetria and decrease of the lumbar lordosis, persistent impairment of sensation throughout the left upper extremity. Baguer had an impaired range of motion and impaired ability to bend, squad, twist, crawl, climb, and lift weight greater than 25 pounds and overhead weights greater than 15 pounds. R. 298–99.

On July 7, 1996, Orlando Regional Medical Center admitted Baguer to the emergency room because of her increasingly depressed mood and anxiety, suicidal ideation, decreased sleep, withdrawn behavior, crying for no reason, and the stressing effects of her eight-year-old son with hyperactivity disorder. R. 300. She was sent to psychiatric facility for further evaluation and stabilization. R. 300. The impression was Depressive Episode with Suicidal Ideation. R. 300. Baguer was depressed with blunted affect and pressured speech. R. 300. On July 17, 1996, the Osceola Mental Health Services wrote a "to whom it may concern" letter stating that Baguer suffered from Anxiety Disorder with Panic Attack and Dysthymic Disorder.[9] R. 301. On November 26, 1996, a

---

7. The diagnosis code is from the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed.1994) [hereinafter "DSM–IV"]. The diagnostic criteria for 300.01 Panic Disorder without Agoraphobia appears at DSM–IV at 394–402.

8. The diagnostic criteria appear in DSM–IV at 626–27 and 655–58.

9. Dysthymic disorder (or dysthymia) is a depressive mood disorder. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed.1994) [hereinafter "DSM–IV"]. The diagnostic criteria for dysthymic disorder is a depressed mood for most of the day (for more days than not) for at least two years, with the presence of two or more of the following: poor appetite or overeating; insomnia or hypersomnia; low en-

psychiatrist at the Osceola Mental Health Services diagnosed DSM–IV 296.32 Major Depression, Recurrent, with Atypical Features.[10] R. 311 (Individualized Treatment Plan). *See also* R. 314 (DSM–IV 296.3 Major Depression, Recurrent, with Phobias).

At the request of the Office of Disability Determinations, William W. Austin, Psy. D., a licensed psychologist at Access Behavioral Care Associates in Kissimmee evaluated Baguer and her medical records on April 21, 1997. R. 318. Dr. Austin noted Baguer's history of anxious symptoms, anger / temper control problems, and occasional crisis stabilization in New Jersey and at the Osceola County Mental Health Center. Her last acute crisis admission was just two weeks before the evaluation. Baguer complained to Dr. Austin of over-sensitivity and irritabilty to the point of aggression when provoked by others. She admitted that she has aggressive ideas of killing people with weapons. R. 318.

On psychometric testing, Baguer's highest score was on the passive-aggressive trait. Avoidant and asocial traits were also highly significant, suggesting a pattern of increasing isolation and social detachment. According to Dr. Austin, anxiety is a significant neurotic clinical symptom. A mixed personality disorder was evident in significant borderline traits and irrational thinking, such as the extreme aggressive thinking observed by

Dr. Austin. Dr. Austin's diagnosis was: Axis I: Adjustment Disorder with Physical Complaints, Anxious Mood, and Work and Social Avoidance; Axis II: Personality Disorder, Not Otherwise Specified (Borderline, Passive–Aggressive, Avoidant, and Asocial Traits); and Axis III: back pain as a result of past injuries constitutes to her adjustment difficulties. R. 318–19.

Dr. Austin observed that Baguer is prone to interpersonal conflicts because of her characteristic instability and quick temper, especially if provoked. R. 321. Her aggression is impulsive, and she shows no remorse. R. 321. Baguer has a character disorder composed of passive-aggressive, antisocial, and dependent traits. She complains of moodiness, nervousness, and somatic symptoms that prevent her from working efficiently. R. 321. Baguer may not relate well to authority figures if she feels unfairly treated, criticized, or misjudged. R. 323. According to Dr. Austin, Baguer is impulsive, unstable, and therefore distractable, with a low frustration tolerance. R. 322. Baguer's ability to behave in an emotionally stable manner is "poor to none." R. 322.

The Orlando Regional Healthcare System, Sand Lake Hospital, admitted Baguer for psychiatric treatment on April 30, 1998, and discharged her on May 2, 1998. R. 9–10. Benjamin Paz Ocampo, M.D. of Kissimmee, FL diagnosed "Psychosis Not Otherwise Specified—Depression / Anxiety." R. 9.[11] Dr. Ocampo continued Ba-

ergy or fatigue; low self-esteem; poor concentration or difficulty making decisions; feelings of hopelessness. DSM–IV at 349. The DSM–IV diagnosis code provides no severity specifier for dysthymic disorder.

**10.** The DSM–IV at 345 and 327 establishes the diagnostic criteria for Major Depressive Disorder, Recurrent. The diagnosis code is 296.3x. The last digit in the diagnosis code is reserved as a severity specifier for the most recent Major Depressive Episode that forms part of the disorder. The severity code ".x2" indicates "moderate." A "moderate" Major Depressive Episode is one that has a severity between "mild" and "severe." DSM–IV at 376–77. A "mild" Major Depressive Episode has "few, if any symptoms in excess of those required to make the diagnosis and symptoms

result in only minor impairment in occupational functioning or in usual social activities or relationships with others." DSM–IV at 377. A "severe" Major Depressive Episode is one that has "several symptoms in excess of those required to make the diagnosis, and symptoms markedly interfere with occupational functioning or with usual social activities or relationships with others." DSM–IV at 378. This diagnosis specified "moderate" severity.

**11.** DSM–IV 298.9 provides the diagnostic criteria for "Psychotic Disorder Not Otherwise Specified." DSM–IV at 315. The diagnosis includes psychotic symptomatology (i.e., delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information

guer on antipsychotic medication with planned follow-up visits.[12] R. 10. The Commissioner later found that Baguer was disabled and eligible for SSI benefits beginning on July 23, 1998—eleven weeks after her May 2, 1998 discharge from Sand Lake Hospital. Docket No. 15, Appendix 1.

The record demonstrates that Baguer has long had an anxiety related disorder that meets or equals Listing 12.06. Her mental disability did not begin on July 23, 1998. Anxiety and depression are the predominant disturbances in Baguer's mental disorder. Both parts of Listing 12.06 (A and B) are satisfied. The record contains evidence of recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, and terror occurring on the average of at least once a week, as well as persistent irrational fear of specific situations. Baguer's anxiety results in marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and in repeated episodes of deterioration or decompensation in work or work-like settings which cause withdrawal.[13]

## C. *Ability to Perform Past Relevant Work*

■ Even if Baguer had in fact failed to meet or equal a listed impairment, the Commissioner erred in finding that she retained the ability to perform her past work as an assembly line worker. Docket

No. 15 at 3–17; R. 318–23. Contrary to the findings of the Commissioner, Baguer's past work did not allow her to work by herself. R. 26, Findings 5–6.

Baguer was born on January 26, 1958 in the Dominican Republic. She studied marketing for two years at a college in the Dominican Republic. R. 72. She has a thirteen year old daughter with epilepsy, and a nine year old son who disabled with dyslexia and hyperactivity disorder. R. 72. Baguer worked at Kester Solder in Newark, New Jersey from April 1988 through August 1991 doing various tasks: 1.) operating a machine that spooled solder wire while sitting or standing; 2.) sometimes working in an office; and 3.) packing and lifting 15 pound boxes after others had sorted the contents. R. 76–78, 120. Baguer's work at Kester Solder required that she work with others, as she implied when she testified about "working in an office" and "when I see that they're sorting ..." R. 77–78.

Kester Solder has confirmed that she worked with others, and has even provided the names of some co-workers. On April 3, 1991, Baguer fought with a co-worker, Francisco Palaez. R. 122, 119. Baguer engaged in a shouting match with Palaez, and sent him to the hospital when she struck him in the forehead with the spiked heel of her shoe. R. 118, 120, 323. Kester Solder suspended Baguer on April 9, 1991

to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder. DSM–IV at 315.

12. Baguer has taken numerous medications for depression, anxiety, dizziness, diarrhea, and heart palpitations. *See* R. 85–88, 91, 129, 218, 286.

13. Although Baguer raises these issues only indirectly in her appeal brief, Docket No. 15 at 6, Baguer also meets or equals Listing 12.04 (Affective Disorders) and Listing 12.08 (Personality Disorders). Baguer has an affective disorder characterized by a disturbance of mood, accompanied by a full depressive

syndrome. She satisfies Listing 12.04 A (psychomotor agitation, suicidal ideation, hyperactivity, pressure of speech, flight of ideas, and easy distractability) and B (see accompanying text regarding Anxiety Related Disorder). Baguer also has a personality disorder characterized by inflexible and maladaptive personality traits that cause significant impairment in social and occupational functioning and subjective distress. She satisfies Listing 12.08 A (seclusiveness, pathologically inappropriate suspiciousness and hostility, oddities of thought, speech and behavior, persistent disturbances of mood, and intense and unstable interpersonal relationships and impulsive and damaging behavior) and B (see accompanying text regarding Anxiety Related Disorder).

because the incident "created havoc in the entire manufacturing facility." R. 122.

Baguer then shouted at Joy Rechsteiner (Personnel Manager) and "Tom" on the telephone. R. 121. Baguer yelled at "Joyce" and treated her poorly, and was verbally abusive to "Jennie" in the office. R. 121. According to the Personnel Manager at Kester Solder, Baguer had a "tough time putting in a 40 hour work week." R. 121.

There were too many outbreaks in any given week to mention. R. 120. According to Kester Solder's production manager, Leon Pieta, Baguer was involved in one disturbance among her co-workers and her line supervisor that was "completely out of control," and Baguer was "totally unpredictable with emotion." R. 120. Baguer had become upset with an older woman with whom she worked, and grabbed her by the neck. R. 118. Kester Solder's production manager stated that Baguer "could not control her emotion regardless of circumstances to herself and others." R. 120. Kester Solder fired Baguer on July 30, 1991 precisely because she created disturbances when she worked with others. R. 119. In light of her severe mental impairment, Baguer has met her burden of proving that she cannot return to her past employment.

### D. *Communication in English*

 Baguer argues that the Commissioner failed to develop a full and fair record because Baguer was unable to communicate in English. Docket No. 15 at 17. Baguer's last argument is meritless. Baguer was represented by counsel at all stages of the disability determination. Although Baguer's English was limited, counsel assisted Baguer in communicating all necessary information to the ALJ. Baguer, who had studied marketing for two years at a university in the Dominican Republic, told the ALJ that she could communicate in English and read English. R. 72. The hearing transcript confirms that Baguer could understand and communicate in English. R. 54–97. The ALJ announced that he would arrange for a consultation with a Spanish-speaking psychologist, R. 95, and then referred Baguer to William W. Austin, Psy. D.R. 318. The ALJ developed a full and fair record. The record, however, supports Baguer's claim that she is disabled.

### VI. *CONCLUSION*

For the reasons stated above, the decision of the Commissioner is **REVERSED.**

### DONE AND ORDERED.