Daniel F. **HURLEY**, Plaintiff,

v.

Jo Anne B. **BARNHART**,
Commissioner of Social
Security, Defendant.

No. 6:03 CV 1624 ORL JGG.

United States District Court,
M.D. Florida,
Orlando Division.

Feb. 23, 2005.

---

Robert F. Sprick, Law Office Of Robert F. Sprick, Orlando, FL, for plaintiff.

## *MEMORANDUM OF DECISION*

GLAZEBROOK, United States Magistrate Judge.

Plaintiff Daniel F. Hurley ["Hurley"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability and disability insurance benefits. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner's decision is **AFFIRMED.**

## I. *PROCEDURAL HISTORY*

On March 30, 2000, Hurley filed a claim for disability insurance benefits and supplemental security income, claiming disability as of February 28, 2000. R. 18, 180–85, 347–50. On April 17, 2002, the Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"], held a hearing on Hurley's claim in Orlando, Florida. R. 38–79. Hurley testified, and his attorney, Robert F. Sprick, appeared with him at the hearing.

On June 27, 2002, the ALJ ruled that Hurley was not entitled to benefits. R. 117–23. The ALJ found, *inter alia,* that Hurley retained the Residual Functional Capacity ["RFC"] to perform a full range of sedentary work. Accordingly, the ALJ applied Medical–Vocational Guidelines ["Grids"] Rules 202.21—201.22, which directed a finding of not disabled. R. 123, Findings 12–13.

Hurley timely appealed the ALJ's decision to the Appeals Council. R. 152–60. On November 1, 2002. the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ. In its remand order, the Appeals Council noted. in relevant part:

> [t]he medical evidence shows that the claimant may have a mental impairment, but the current evidence of record is not sufficient to properly assess the nature and severity of that condition.... Regardless, the evidence of record as a whole suggests that the claimant may have a significant mental impairment that requires further evaluation.
>
> ... The [hearing] decision states that [Hurley's] nonexertional limitations

would not significantly diminish the claimant's capacity for the full range of sedentary work; however, this conclusion is not supported by expert vocational evidence . . . .

The hearing decision indicates . . . that the claimant's subjective complaints are beyond what would reasonably be expected in terms of intensity . . . but does not address whether the claimant has an underlying medically determinable physical or mental impairment . . . .

R. 162–63. Therefore, the Appeals Council directed the ALJ to 1.) obtain additional evidence concerning Hurley's impairments, including updated records from Hurley's treating sources, a consultative orthopedic exam, and a consultative psychiatric exam; 2.) if necessary, obtain medical expert testimony to help clarify the severity of Hurley's mental impairments; 3.) give further consideration to Hurley's subjective complaints; 4.) obtain evidence from a vocational expert; and 5.) if warranted, conduct further proceedings to determine whether alcoholism is a contributing factor material to a finding of disability. R. 163–64.

On May 14, 2003, Judge Jones held a supplemental hearing on Hurley's claim in Orlando, Florida. R. 80–106. Hurley testified, and his attorney, Robert F. Sprick. appeared with him at the hearing. The ALJ also heard testimony from vocational expert ["VE"] Robert San Filippo. On May 29, 2003. the ALJ issued her second decision that Hurley was not entitled to benefits. R. 18—28. Following a review of the medical and other record evidence, the ALJ found that although Hurley has severe impairments, he does not have an impairment or combination of impairments that meets or equals a listed impairment. R. 27, Findings 3–4. The ALJ also found that Hurley's subjective complaints including allegations of incapacitating pain and mental limitations were not fully credible. R. 27, Finding 5. Further, the ALJ determined that Hurley was incapable of performing his past relevant work, but that he retained the RFC to perform a limited range of light work.[1] R. 27—28, Findings 8 and 12. Accordingly, the ALJ applied Grids Rules 202.20—202.22 as a framework and relied on VE testimony to determine that Hurley was not disabled. R. 28, Findings 13—14.

Subsequently, Hurley appealed the ALJ's decision to the Appeals Council. R. 13–14 Finding no error or abuse of discretion, the Appeals Council denied review on October 23, 2003. R. 8–12. On November 13, 2003, Hurley timely appealed the Appeals Council's decision to the United States District Court for the Middle District of Florida. Docket No. 1. On May 6, 2004. Hurley filed an amended memorandum of law in support of his appeal of the denial of review.[2] Docket No. 19. On June 2, 2004, the Commissioner filed a memorandum in support of her decision that Hurley was not disabled. Docket No. 20. The appeal is ripe for determination.

## II. *THE PARTIES' POSITIONS*

Hurley assigns four errors to the Commissioner's decision: 1.) failing to develop the record concerning Hurley's allegations of pain; 2.) presenting to the VE a hypo-

---

1. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, the Commissioner determines that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

2. Hurley initially filed a memorandum in support of his appeal on April 29, 2004. Docket No. 17. Subsequently, he withdrew this memorandum (see Docket No. 18) and filed the instant memorandum.

thetical question not supported by substantial evidence; 3.) failing to consider Hurley's combination of impairments: and 4.) improperly according weight to the opinions of Hurley's medical providers. Pl.'s Brief at 7—17.

The Commissioner responds that her decision was supported by substantial evidence and was decided by proper legal standards. The Commissioner asserts that: 1.) Hurley's allegations of disabling pain were embellished and unsupported; 2.) substantial evidence supported the ALJ's hypothetical questions; 3.) the ALJ properly evaluated Hurley's impairments; and 4.) the ALJ properly accorded weight to Hurley's treating and non-treating sources. Def.'s Brief at 9–17.

## III. *THE STANDARD OF REVIEW*

### A. *Affirmance*

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir.1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir.1982) and *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n. 3 (11th Cir.1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n. 3 (11th Cir.1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.1991). The dis-

trict court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir.1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B. *Reversal and Remand*

■ Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir.1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636—37 (11th Cir.1984).

■ The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089—92, 1095, 1098 (11th Cir.1996). To remand under sentence four, the district court must either

find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson,* 99 F.3d at 1090—91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris,* 621 F.2d 688. 690 (5th Cir.1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

■ Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler,* 732 F.2d 827, 829—30 (11th Cir.1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler,* 721 F.2d 726, 729 (11th Cir.1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir.1984) (ALJ should consider on remand the need for orthopedic evaluation). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson,* 99 F.3d at 1089, 1095.

■ In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material—relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson,* 99 F.3d at 1090—92; *Cannon v. Bowen,* 858 F.2d 1541, 1546 (11th Cir.1988); *Smith v. Bowen,* 792 F.2d 1547, 1550 (11th Cir.1986); *Caulder v. Bowen,* 791 F.2d 872, 877 (11th Cir.1986); *see also Keeton v. Dept. of Health and Human Serv.,* 21 F.3d 1064, 1068 (11th Cir.1994).

■ A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson,* 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson,* 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id.*

## C. *Standard of Review for Evidence Evaluated by Appeals Council*

After the ALJ's decision—but before the Appeals Council decision—Hurley's counsel prepared and submitted to the Appeals Council a letter containing arguments for consideration on appeal, but he did not submit any additional evidence. R. 363–70. The Appeals Council properly made the letter a part of the record, and also considered it in denying review. R. 12. The district court also must consider the

letter in determining whether the Commissioner erred in denying review of the ALJ's decision.

■ Congress left the term "final decision" undefined in 42 U.S.C. § 405(g). Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review, the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g). *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083, 147 L.Ed.2d 80 (2000); *accord Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983). The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence. 20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir.1986) (en banc). The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

■ Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's review is similarly broad. *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000). The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues. *Sims*, 120 S.Ct. at 2086. When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review. 20 C.F.R. § § 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086; *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir.1994). Furthermore, the Appeals Council commits reversible error when it refuses to consider new evi-

dence and then denies review. *Keeton*, 21 F.3d at 1066. Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ—and to ignore the new evidence presented to the Appeals Council—in reviewing a decision of the Appeals Council. *Keeton*, 21 F.3d at 1066.

■ The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. *Sims*, 120 S.Ct. at 2086; *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir.1998). When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence. *Falge*, 150 F.3d at 1323; *accord. Eads v. Secretary of Health and Human Services*, 983 F.2d 815, 817 (7th Cir.1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him). Nevertheless, there is an important difference between *Falge* and this case—a difference stressed by the United States Court of Appeals for the Eleventh Circuit. In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review. Instead he appealed only the *ALJ's decision* to deny benefits. 150 F.3d at 1324. In this case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's decision to deny review. Docket No. 1 at 1–2. The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review. *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066.

■ Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision—the last step of review necessary to exhaust administrative remedies. When the Appeals Council refuses to consider new evidence

submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. *Sims,* 120 S.Ct. at 2086; *Keeton,* 21 F.3d at 1066. Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. *See Falge,* 150 F.3d at 1324; *Keeton,* 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record). The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered claimant's additional arguments in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion. and determining that the ALJ's findings are supported by substantial evidence. The Appeals Council's determination is subject to judicial review. The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review." *See Sims,* 120 S.Ct. at 2086; *accord Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)).

## IV. *THE LAW*

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505—404.1511.

### A. *Treating Physicians*

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan,* 125 F.3d 1436, 1439—1441 (11th Cir. 1997); *Edwards v. Sullivan,* 937 F.2d 580, 583 (11th Cir.1991); *Sabo v. Commissioner of Social Security,* 955 F.Supp. 1456, 1462 (M.D.Fla.1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or

report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards,* 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler,* 784 F.2d 1073, 1075 (11th Cir.1986); *see also Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir.1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler,* 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527(d)(2).

■■■ The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and

404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

### B.  *Developing the Record*

■■■ The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen,* 854 F.2d 436, 438 (11th Cir.1988); *Cowart v. Schweiker,* 662 F.2d 731, 735—36 (11th Cir.1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C. § 406; *Cowart,* 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart,* 662 F.2d at 735—36. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala,* 44 F.3d 931, 934—35 (11th Cir.1995), *citing Smith v. Schweiker,* 677 F.2d 826, 829 (11th Cir.1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart,* 662 F.2d at 735 (citations omitted).

### C.  *Medical Tests and Examinations*

■■■ The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also Conley v. Bowen,* 781 F.2d 143, 146 (8th Cir.1986). In fulfilling his duty to

conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir.1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir.1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

### D. *The Five Step Evaluation*

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir.1993). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See id.*, 985 F.2d at 534.

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir.1991). The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir.1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir.1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after the claimant has lost insured status, his or her claim for disability benefits must be denied despite the disability. *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir.1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir.1978).

### E. *The Evaluation of Mental Disorders*

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work. The listings for mental disorders are arranged in eight diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The criteria in paragraphs B and C of the Listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work—i.e. limitations in functional areas deemed essential to work.

A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526. An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity. The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In assessing mental disorders under the Listings, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The

technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt.

P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Some individuals may actually have worked during the period of time pertinent to the determination of disability. Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder. e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594(iv).

### F. *Other Work*

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater,* 67 F.3d 1553, 1559 (11th Cir.1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote,* 67 F.3d at 1558; *Allen v. Sullivan,* 880 F.2d 1200, 1201 (11th Cir.1989). This burden may sometimes be met through exclusive reliance on the Medical–Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2,

§ 200.00(e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

■ Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002–03 (11th Cir.1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir.1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert). It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir.1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### 1. *Pain*

■ Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559, 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir.1992), although an individual's statement as to pain is not, by itself, conclusive of disability, 42 U.S.C. § 423(d)(5)(A).

### 2. *Credibility*

■ Where · an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote*, 67 F.3d at 1561–62; *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir.1991) (articulated reasons must be based on sub-

stantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowen,* 831 F.2d 1007, 1012 (11th Cir.1987); *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir.1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561–62; *Cannon v. Bowen,* 858 F.2d 1541, 1545 (11th Cir. 1988).

■■■ A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker,* 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater,* 67 F.3d at 1562 (quoting *Tieniber v. Heckler,* 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V. *APPLICATION AND ANALYSIS*

### A. *The Facts*

Born on June 7, 1958, Hurley was forty-four years old at the time of the ALJ's decision.[3] R. 180. Hurley has a high school education, and his past relevant work experience includes employment as a construction laborer, electronic technician, and machinist mate. R. 87, 89–90. Hurley claims an inability to work beginning February 28, 2000. R. 180.

In January 2000, Hurley was injured when a car struck him while he was riding a bike. R. 71–72. On January 10, 2000,

Hurley went to the Veterans Administration Medical Clinic ["VAMC"] with complaints of back pain and hand numbness. Hurley admitted drinking a "6–pack" of alcohol during the previous night. Notes indicate that Hurley appeared to be slightly inebriated, had some slurring in his speech, and walked somewhat off balance. In addition, he smelled of alcohol. The VAMC prescribed medication. R. 255.

On January 27, 2000, Hurley returned to the VAMC. Notes indicate that Hurley was advised to stop drinking alcohol and was offered alcohol rehabilitation, but he declined. X-rays of the lumbar spine showed no acute fractures or dislocations, and vertebral alignment was maintained. Vertebral body and remaining disc space were well maintained. There was mild narrowing of the L1–2 and L4–5 disc spaces, and mild degenerative osteophytic spurring from L1—L5. The impression was degenerative changes. R. 252–53.

On February 17, 2000, Hurley underwent a CT scan of the lumbar spine. The impressions were bulging disc at L4–5 with stenosis of the lateral recesses and lateral neural canals bilaterally, degenerative joint disease of facets between L3–4, L4–5 and L5–S1, but no other herniated or bulging discs. R. 251.

Hurley returned to the VAMC on March 1, 2000, requesting a prescription refill for Naproxen. R. 250. On March 28, 2000, Hurley requested stronger anti-inflammatory medication and a further refill for Naproxen. On May 25, 2000, Hurley failed to appear for a scheduled appointment. On June 8, 2000, Hurley returned to the VAMC, requesting stronger medication for back pain. He also wanted to see a social worker. Notes indicate that Hurley appeared disheveled, and had an unlit cigarette in his hand. R. 249.

---

**3.** He is now 46.

On July 3, 2000, Hurley complained of continuing severe lower back pain and requested a refill for Darvon. Hurley stated that he was homeless, and that his stock of Darvon had been stolen. Notes indicate that Hurley continued to drink several cans of beer daily. Staff physician Cheryl Smith–Martinez noted neck pain. Hurley had intermittent numbness of his left arm. R. 245.

Hurley missed a scheduled appointment on September 15, 2000. On November 16, 2000, Hurley went to Edward K. Fraser, M.D., for complaints of chronic back pain radiating to the legs. The impressions were chronic low back pain, bulging disc, alcohol abuse, and possible overuse of Naprosyn. Dr. Fraser discontinued Naprosyn and prescribed Salsalate. Dr. Fraser encouraged Hurley to discontinue alcohol and tobacco use, R. 234–35. Dr. Fraser drafted a one-sentence note addressed "To Whom it May Concern," stating that Hurley had a diagnosis of chronic lower back pain with bulging discs. and was unable to work. R. 240.

On December 18, 2000, Hurley returned to Dr. Fraser for complaints of increased back pain and for running out of his medication. The diagnoses were chronic lower back pain and alcohol abuse. Dr. Fraser discontinued Salsalate and prescribed Lodine. He advised Hurley to stop drinking alcohol. Hurley requested Dr. Fraser to draft a note for a judge regarding his ability to do volunteer work. Dr. Fraser drafted a note advising Hurley to avoid bending or lifting greater than five pounds. R. 230–38. A consultation note dated December 26, 2000, states that Hurley was discharged from physical therapy for failing to attend a scheduled appointment. R. 236.

On January 19, 2001, Alex C. Perdomo, M.D., performed a consultative examination. In reviewing Hurley's past medical history and medical records, Dr. Perdomo noted that Hurley was recently diagnosed with osteoarthritis, degenerative disc disease, but no herniated disc. He noted that Hurley had undergone physical therapy, epidural injections, and medications, which provided minimal improvement. He also noted that Hurley smoked one pack of cigarettes and consumed six beers daily, and smelled of alcohol. Examination indicated a slightly decreased range of motion of the cervical spine, upper extremities, and thoracolumbar spine. Mental status examination was normal. The impressions were history of chronic low back pain with mild muscular/skeletal functional limitations, history of osteoarthritis and degenerative disc disease, and alcohol abuse. Dr. Perdomo advised physical therapy, more aggressive pain management, and enrollment in an alcohol detoxification program. Dr. Perdomo opined that Hurley could perform well in light duty job, with no prolonged standing or walking, repetitive bending, and no lifting over twenty-five pounds. R. 226–27.

On February 16, 2001, a state agency physician performed a physical residual functional capacity assessment. The physician determined that Hurley was capable of occasionally lifting/carrying twenty pounds, frequently lifting/carrying ten pounds, standing/sitting/walking for six hours, and was unlimited in pushing/pulling. In all other aspects he determined that Hurley was not limited. R. 256–63.

On April 12, 2001, Jose M. Suarez, M.D., performed a consultative psychiatric evaluation upon referral from Hurley's attorney. Hurley described feeling worthless, having constant back pain, and experiencing constant nightmares from his prior Navy service in Vietnam. Hurley further stated that he drank twelve beers daily and smoked constantly. Dr. Suarez noted that Hurley had alcohol in his breath. Based upon Hurley's statements, the office

notes of Dr. Fraser, and the results of a prior CT scan of the lumbar spine, but without any diagnostic testing, Dr. Suarez' diagnoses were alcohol dependence, major depressive disorder recurrent type, and alcohol induced dementia. Hurley's Global Assessment of Functioning score was 60.[4] Dr. Suarez opined that Hurley was totally disabled from a psychiatric standpoint, and advised him to seek detoxification. R. 264–66. Dr. Suarez also completed a Mental Residual Functional Capacity Questionnaire. He determined that Hurley had a GAF of 50,[5] and that Hurley exhibited depression-related marked and extreme functional limitations related to social interaction, sustained concentration and persistence, and adaptation. R. 267–75.

Hurley returned to Dr. Fraser on June 25, 2001, for complaints of chronic low back pain. Hurley stated that he last consumed alcohol three days earlier, but he also stated that he previously drank alcohol whenever it was available. The relevant diagnosis was chronic low back pain. Dr. Fraser encouraged Hurley to stop alcohol and offered counseling, but Hurley declined. R. 294.

On December 10, 2001, Hurley underwent an MRI of the neck. The MRI showed a disc bulge at the C5–6 vertebra, mild-to-moderate narrowing of the spinal canal, and moderate-to-severe narrowing of the right lateral recess. There was also mild narrowing of the lateral recesses bilaterally due to spurring of the articular facets and uncinate processes, but no evidence of disc herniations or stenosis at C2–3, C3–4, C4–5, C6–7 and C7–T1. The impression was disk bulge at C5–6. R. 293.

On April 30, 2002, Dr. Suarez completed two mental impairment questionnaires, one for non-alcohol psychiatric problems and one for alcohol psychiatric problems. Dr. Suarez' impressions were based on his one-time evaluation of Hurley in April 2001. In the non-alcohol assessment, Dr. Suarez determined that Hurley had marked or extreme limitations in his restriction of activities of daily living, difficulties in maintaining social functioning, and constantly had deficiencies of concentration, persistence, or pace. R. 295–98. In the alcohol-related assessment, Dr. Suarez determined that Hurley had moderate limitations in his restriction of activities of daily living, difficulties in maintaining social functioning, and often had deficiencies of concentration, persistence, or pace. R. 299–303.

On May 7, 2002, Dr. Fraser completed a Physical Residual Functional Capacity Assessment. Dr. Fraser opined that, based on radiological studies indicating disc bulges with spinal stenosis in lumbar spine and degenerative changes on the knee, Hurley could frequently lift less than ten pounds, stand/walk at least two hours, sit about six hours but must alternate sitting and standing to relieve pain, and was unlimited in pushing and pulling abilities. There were no limitations related to climbing, balancing, stooping, kneeling, crouching, crawling. Reaching was limited. The only environmental limitations were to

4. The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. *Diagnostic and Statistical Manual of Mental Disorders* (*DSM–IV*) at 32 (4th ed.1994). A GAF code of 51–60 indicates moderate symptoms, or moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 32.

5. A GAF code of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), OR serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job). *DSM–IV* at 32.

avoid concentrated exposure to fumes, odors, dusts, gases, and working around machinery and heights. In all other respects, Hurley had no limitations. R. 304–11.

On May 10, 2002, Hurley appeared for addiction therapy. His therapist noted alcohol in Hurley's breath. R. 344. On May 22, 2002, Hurley went to the VAMC after being attacked. His left eye was puffy, completely closed, and was bruised. There were lacerations on the left side of his face, and bruising under his right eye, X-rays showed a fractured clavicle. R. 341–43. On June 10, 2002, Hurley returned to Dr. Fraser for a refill for Percocet. Dr. Fraser noted that surgery was not required for his fractured clavicle. The clavicle area had significantly decreased swelling. R. 336. On June 18, 2002, Hurley returned to Dr. Fraser, insisting on a refill for his narcotic medication previously prescribed ten days earlier. He stated that his medication had been stolen, and presented a police report reflecting theft of unspecified medication. Hurley received a three-day supply of Percocet, and was warned that in the future he will be responsible for his medication. Notes indicate that Hurley could walk without problems, and did not appear to be in any acute distress. Hurley was taking Tylenol for pain. R. 334–35.

On July 17, 2002, Dr. Fraser recommended light duty work. On that same date, Dr. Fraser wrote a note for Hurley's community service indicating that Hurley could perform light duty work with no crawling, climbing or heavy lifting. R. 330.

On November 18, 2002, Dr. Fraser advised Hurley that he would not renew Hurley's Percocet unless Hurley discontinued alcohol. Instead, he prescribed Tylenol 3. R. 328. On December 16, 2002, Hurley returned to Dr. Fraser, complaining of neck and back pain. He represent-ed to Dr. Fraser that he had stopped drinking alcohol. The diagnoses were chronic low back pain, and chronic neck pain with disc disease. Dr. Fraser prescribed Percocet with precautions. R. 326.

On January 28, 2003, James P. Ryan, IV, M.D., performed a consultative orthopedic evaluation at the ALJ's request. Dr. Ryan noted that Hurley was able to walk and sit comfortably, did not require a cane or walker, and was able to climb on and off an examining table. Hurley's upper extremity strength was excellent, with excellent grip strength, and he had full range of motion of his elbows, shoulders, and wrists, with a slightly decreased range of motion of the neck. There was swelling and tenderness of the left knee with slightly decreased range of motion; straight leg raising was negative and there was no motor or sensory loss. Palpation of the back showed diffuse mild tenderness. X-rays taken that day revealed that all disc spaces were well maintained, and there was only minimal spur formation. The assessments were degenerative disc disease in the lumbar spine with mild radicular symptoms, mild cerebellar disease most likely due to chronic alcohol use, and probable arthritis of the left knee. Dr. Ryan opined that Hurley could perform light to moderate duty work. R. 36, 312–13.

Dr. Ryan also completed a Medical Source Statement of Ability to do Work–Related Activities (Physical) form. He indicated that Hurley could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand/walk about six hours in an eight hour workday. Sitting and pushing/pulling were unlimited, and Hurley could occasionally climb, balance, kneel, crouch, crawl and stoop. Hurley was unlimited in all other respects. R. 316–18.

On January 30, 2003, Bruce G. Borkosky, Psy.D., P.A., performed a consultative

psychological evaluation at the request of the ALJ. Hurley stated that he was not taking psychotrophic medications or undergoing outpatient psychotherapy. He denied having a history of alcohol or drug abuse, and he denied drinking daily or in the mornings. Dr. Borosky noted that Hurley's body movement, walk, and gait were normal, and he required no assistance to ambulate. Atypical psychomotor activity included significant hand tremor, and apparently painful hand operation. Pain behaviors were significant. However, when Hurley asked the difference between a psychologist and a psychiatrist, and Dr. Borosky responded that a psychologist was not a medical doctor, he immediately stopped "jerking." Hurley underwent an MMPI–2 test; however, Dr. Borosky noted that the results might be invalid due to symptom exaggeration. Dr. Borkosky stated that Hurley's history and background should be reviewed to determine whether a medical or neuropsychological evaluation was warranted. Dr. Borkosky also stated that Hurley might prefer to focus on his physical symptoms rather than on any psychological problems. The possible diagnoses were somatoform disorder, substance-induced mood disorder, major depressive disorder, alcohol abuse, cognitive disorder NOS, schizotypal personality disorder, provisional, and borderline personality disorder, provisional. Dr. Borosky suggested individual and group psychotherapy, as well as pain management. He determined that Hurley's prognosis was fair. In terms of functional ability. Hurley had a good ability to understand, remember and carry out instructions, and a fair ability to respond appropriately to supervision, co-workers, and work pressures. R. 36, 319–22.

On February 28.2003, Dr. Borosky completed an Ability to do Work–Related Activities (Mental) form, Dr. Borosky opined that Hurley had slight limitations in his ability to carry out short, simple instructions, moderate limitations in his ability to perform detailed instructions, and slight limitations in his ability to interact with others. He also stated that it was likely that most, if not all, of Hurley's limitations were directly or indirectly related to alcohol abuse. R. 323–25.

### B. *The Analysis*

### 1. The ALJ Properly Evaluated Hurley's Allegations of Pain.

██ Hurley asserts that the ALJ failed to properly evaluate his complaints of pain. At the administrative hearings. Hurley testified that he experienced "extreme" pain in his back, knee, neck, arms, shoulder. and hands. He described having pain radiating into his hands, causing him to lose control of his fingers. Hurley added that as a result of his condition, he was able to walk only one-half of a block and then must sit for ten minutes, could stand for only five minutes, and could not squat or tie his shoes. R. 56–57, 85–86. The ALJ found Hurley's allegations to be "somewhat embellished and out of proportion to the diagnostic and clinical findings." The ALJ was correct.

The evidence shows that Hurley suffers from degenerative disc disease, two bulging discs, and probable arthritis in the left knee. Radiological scans of the lumbar spine taken in January—February 2000 showed mild degenerative changes of the lumbar spine, a bulging disc, but no other herniated or bulging discs. R. 252–53. An MRI of the neck performed in December 2001 showed a disc bulge. R. 293. X-rays of the lumbar spine taken in January 2003 showed well-maintained disc spaces. R. 313.

Dr. Fraser treated Hurley from about November 2000 until at least December 2002. Throughout this period, he treated Hurley conservatively with medication and physical therapy. In May 2002, Dr. Fra-

ser stated that Hurley was generally capable of performing sedentary work; three months later, however, Dr. Fraser opined that Hurley could return to light duty work. R. 304–11, 330. In addition, in January 2001, Dr. Perdomo, a one-time consulting source, opined that Hurley could perform well in light work that did not require prolonged standing or walking, or repetitive bending. R. 226–27. Further, in February 2001, a state agency physician determined that Hurley was capable of performing light duty work. R. 256–63. Finally, in January 2003, consultative physician Dr. Ryan diagnosed Hurley with degenerative disc disease with mild radicular symptoms, and probable left knee arthritis. R. 313. Thus, substantial evidence does not show an underlying medical condition of such a severity that could reasonably be expected to give rise to Hurley's allegations of totally disabling pain.

### 2. Substantial Evidence Supported the ALJ's Hypothetical Questions.

■■■ Hurley next asserts that the ALJ's posed to the VE hypothetical questions that were not supported by substantial evidence. The Court disagrees. As discussed above, the evidence shows that Hurley experienced some back and lower extremity pain, but the pain was not totally disabling. In addition, the record shows mild mental impairments. From about January 2000 until at least May 2002, Hurley's medical providers consistently diagnosed him with alcohol abuse or noted alcohol in his breath. R. 226–27, 230–38, 252–53, 255, 264–66, 328, 344. Hurley has also been diagnosed with somatoform and substance-induced disorders, a major depressive disorder, possible cognitive disorder, and a substance addition disorder. However, Hurley never sought any continuing treatment for these conditions. In fact, there are no records from any treating sources. The only relevant evidence comprises reports from two one-time consulting sources, Dr. Suarez and Dr. Borosky. Dr. Suarez performed a consultative examination in April 2001. Based solely upon Hurley's statements and a review of past medical records, but without performing any diagnostic testing, Dr. Suarez determined that Hurley had marked and extreme functional limitations related to social interaction, concentration, persistence, and adaptation, and a GAF ranging from 50—60. R. 272–75. However, at the initial administrative hearing, Hurley testified that he had not been truthful with Dr. Suarez. Specifically, Hurley testified that he was "just playing with [Dr. Suarez'] head" regarding Hurley's alcohol problem. Due to Hurley's dishonesty and an absence of evidence to support Dr. Suarez' findings, the ALJ accord little to no weight to Dr. Suarez' opinions. Instead, the ALJ gave substantial weight to Dr. Borosky.

Dr. Borosky performed a consultative examination in January 2003. However, Hurley made misrepresentations to Dr. Borosky, as well, denying having a history of alcohol or drug abuse. R. 323–25. Also, Dr. Borkosky noted that despite Hurley's alcohol abuse and substance-induced mood disorder, he had good a ability to understand, remember, and carry out instructions, and a fair ability to respond appropriately to supervisors, co-workers, and work pressures. R. 322. Finally, while Hurley testified that he did not consume alcohol on a daily basis, and that he had stopped drinking three to four months prior to the hearing, the record shows he continued to drink. R. 226–27, 244, 290, 294, 312.

Based on the foregoing, the ALJ determined that Hurley retained the RFC for a limited range of light work, specifically, to frequently lift/carry ten pounds, occasionally lift/carry twenty pounds, walk/stand

for six hours, and sit/push/pull without restriction, and to occasionally climb, balance, kneel, crouch, crawl, and stoop. The ALJ further found that Hurley had moderate limitations in concentration, persistence, and pace, no limitations in the ability to understand short and simple instructions, and a slight limitation in the ability to carry out short and simple instructions.

Accordingly, in her first hypothetical question, the ALJ asked the VE to assume an individual who has:

a slight restriction in ability to carry out short, simple instructions, to interact appropriately with the public, to interact appropriately with supervisors, with co-workers. And to respond appropriate [sic] to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. . . . And he has a moderate limitation in the ability to understand and remember detailed instructions, and to carry out detailed instructions.

R. 99. The VE responded that such an individual could perform his part relevant work and also other work. R. 100.

Next, the ALJ added the following physical limitations:

the individual could lift 20 pounds occasionally, 10 pounds frequently. Can stand six hours of an eight-hour day. Sitting is not affected. His push/pull is not affected. He can occasionally climb, balance, kneel, crouch, crawl, or stoop
. . . .

R. 103. The VE responded that Hurley could not return to his past relevant work, but could do other work. The ALJ asked the VE whether Hurley could perform his past work if, given the previous limitations, he had a college degree. The VE stated that Hurley could not return to his past work.

In hypothetical no. 3, the ALJ added additional limitations as determined by Dr. Fraser, Hurley's treating physician:

[t]he individual can occasionally and frequently lift less than ten pounds. Can stand/walk for at least two hours of an eight-hour day. He's to never climb down, stoop, kneel, crouch, crawl. He's limited—or his reaching is limited in all directions, including overhead. He's to avoid concentrated exposure to odors, fumes, gasses, dust and poor ventilation; and to avoid all exposure to hazards such as machinery.

R. 104. The VE responded that he could not perform his past work, but that he could perform unskilled sedentary work, such as a bench worker, small parts assembler, a sorter, and a surveillance monitor. R. 104.

Finally, in her fourth hypothetical, the ALJ asked the following:

if I add to hypothetical three the fact that the individual has extreme restriction of activities of daily living, marked difficulties maintaining social functioning, and constant deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, with three or more episodes of decompensation in a work- or work-like settings which cause the individual to withdraw from that situation, or to experience exacerbation of signs and symptoms, which may include deterioration of adapted behaviors.

R. 105. The VE responded that Hurley could not perform any work.

The ALJ's hypothetical questions incorporated all of Hurley's functional limitations. Hypothetical no. 2 accurately reflected Hurley's RFC, as the ALJ had determined. The ALJ relied on the VE's response to find that Hurley was not disabled. But the ALJ did not stop there. Perhaps in an abundance of caution, the

ALJ posed two additional hypotheticals that included limitations even more restrictive than she found to be supported by the evidence. In response to hypothetical no. 3, the VE testified that Hurley could work. Therefore, the Commissioner carried her burden of proving that Hurley could perform other work.

### 3. The ALJ Correctly Accorded Weight to the Opinions of Hurley's Physicians.

■■■ Hurley next argues that the ALJ did not accord weight to the opinions of Drs. Suarez and Fraser, and instead, accorded greater weight to one-time consulting sources Drs. Ryan and Borosky.[6] However, as discussed above, the ALJ properly rejected the opinions of Dr. Suarez because 1.) Hurley admitted to being dishonest with him; 2.) Dr. Suarez' opinions were not consistent with the evidence; and 3.) substantial evidence did support the opinions of Dr. Borosky. Hurley is also wrong that the ALJ did not accord weight to Dr. Fraser's opinions. In fact, the ALJ did accord weight to Dr. Fraser's opinions. In May 2002, Dr. Fraser stated that Hurley retained an RFC for sedentary work. Two months later, however, Dr. Fraser determined that Hurley could perform light work. The ALJ concluded, therefore, that Dr. Fraser's opinions were consistent with light work. Moreover, the ALJ formulated a hypothetical question based on Dr. Fraser's conclusion that Hurley could perform only sedentary work. It is plain that the ALJ gave proper weight to the opinions of Dr. Fraser.

Finally, the ALJ properly accorded substantial weight to the opinions of Dr. Ryan, a one time consultative source, who determined that Hurley could perform light work. Dr. Ryan's opinion is consistent with Dr. Fraser's opinions, the state agency physicians' opinions, and the clinical and diagnostic findings, and is also the most recent assessment in the record. Plainly, the ALJ properly accorded weight to Hurley's treating and consultative sources.

### 4. The ALJ Properly Considered Hurley's Combination of Impairments.

■■■ Hurley contends that the ALJ did not consider a combination of impairments by failing to specifically recite that Hurley suffered from numbness in his left arm, and memory/concentration problems as a side effect of his medication. This contention is meritless. The ALJ found that Hurley has degenerative disc disease of the lumbar and cervical spine, asymptomatic hepatitis C infection, probable arthritis in the left knee, mild cerebellar disease due to chronic alcohol abuse, somatoform and substance-induced disorders, a major depressive disorder, a possible cognitive disorder, and a substance addiction disorder. Beyond these impairments, the evidence does not support Hurley's contentions of numbness and side effects.

## VI. CONCLUSION

For the reasons stated above, the decision of the Commissioner should be AF-

---

**6.** Hurley also argues that the opinions of Drs. Ryan and Borosky (issued in January 2003) are not relevant because they were non-retrospective, contemporaneous opinions issued after Hurley's date last insured (March 31, 2002). R. 187. This argument is meritless, as Drs. Ryan and Borosky indicated that they reviewed past medical records, and also took a detailed medical history of Hurley. Moreover, the evidence between March 2002 and January 2003 does not indicate any significant change in Hurley's condition. Therefore, the opinions of Drs. Ryan and Borosky accurately reflect Hurley's condition prior to the expiration of his date last insured.

FIRMED. The Clerk should enter a judgment.